SULLIVAN v. MILLIKEN.

(Circuit Court of Appeals, Fifth Circuit. January 7, 1902.)

No. 1,080.

BROKERS—RIGHT TO COMPENSATION—SUFFICIENCY OF SERVICES.

A declaration set out a writing by which defendant authorized plaintiff to sell for him certain timber lands and other property for a price stated, such authority to continue for 60 days. It alleged that, by defendant's request, plaintiff prepared a written memorandum more specifically describing the property; that plaintiff procured within the 60 days the making of a written contract between defendant and a third person, which was set out, and by which defendant agreed to convey the property on terms therein stated, and the other party agreed to have the same examined within 60 days, and to purchase the same if it should appear from said examination that the statements contained in plaintiff's memorandum were substantially correct; that, by reason of the premises, defendant became indebted to plaintiff for his services in the sum of

$100,000, for which judgment was prayed. *Held*, that such declaration must be construed as one to recover commissions as a broker, and was demurrable as failing to state a cause of action, because, under the contract pleaded, plaintiff could recover only by proving (1) either that he had made an actual sale of the property, or (2) that within the time limited he had procured a purchaser able and willing to buy it on the terms stated, and that a sale was prevented by some act or default of defendant, neither of which facts was alleged.

McCormick, Circuit Judge, dissenting in part.

In Error to the Circuit Court of the United States for the Northern District of Florida.

This action was brought by William Alfred Milliken, a citizen of New York, against Martin H. Sullivan, a citizen of Florida. The case was first tried on a declaration containing 12 counts, and resulted in a verdict for the defendant, Sullivan. A new trial was granted by the circuit court, and the plaintiff amended his declaration by adding counts numbered 13 and 14. These counts differ but little, and counsel for the plaintiff (the defendant in error here) agrees that count No. 14 may be eliminated. The case was tried and is here considered as based on the thirteenth count, which will be referred to herein as constituting the declaration. It is as follows, including the three exhibits:

"The plaintiff sues the defendant, for that before the institution of this suit, to wit, on and before October 12, 1899, the defendant employed the plaintiff to sell the pine timber lands of the defendant in the state of Alabama, comprising about 250,000 acres, lying in the counties of Escambia, Conecuh, Monroe, and Baldwin, together with the railways and mills situated thereon, for the sum of one million five hundred thousand dollars, and defendant's wharf in the city of Pensacola, Florida, for the sum of one hundred thousand dollars, and, as evidence of the said employment, executed and delivered to the plaintiff on October 12, 1899, a written instrument, a copy of which is hereto attached, marked 'Exhibit A,' and made a part hereof; that, for the purpose of a fuller specification and description of the said property, the plaintiff, at the request of and for the defendant, prepared a written memorandum more fully describing the said property, a copy of which memorandum is hereto attached, marked 'Exhibit B.' That in pursuance of the said employment the plaintiff procured that the defendant and one W. D. Mann should and did on November 16, 1899, enter into a written contract by which the defendant agreed to convey the property mentioned in the written authority and memorandum hereinbefore set forth as Exhibits A and B (which memorandum is the memorandum referred to in the said written contract) to a corporation to be organized by the said Mann as set forth in the said agreement, and the said Mann agreed to cause the said corporation to be organized, and to pay to the defendant for the said property five hundred thousand dollars in cash, one million dollars in the first mortgage bonds, and one hundred thousand dollars in the stock, of the said company, all of which is set forth in the said agreement which is hereby referred to, and, as Exhibit C, hereto attached and made a part hereof for greater particularity and exactness. Plaintiff avers that by reason of the premises he became entitled to demand and receive from the defendant and the defendant became obliged to pay to the plaintiff, for his services aforesaid, a large sum, to wit, the sum of one hundred thousand dollars, which sum, or any part thereof, the defendant has refused to pay to plaintiff, although often requested so to do, to the damage of plaintiff of one hundred thousand dollars, whereupon he sues."

### Exhibit A.

"New York, October 12th, 1899.

"W. A. Milliken, Esq., N. Y. City.—Dear Sir: I hereby authorize and empower you to sell my pine timber lands in the state of Alabama, comprising about 250,000 acres, lying in the counties of Escambia, Conecuh, Monroe, and Baldwin, together with the railways and mills situated thereon, for the

sum of $1,500,000; also my wharf in the city of Pensacola, Fla., for the sum of one hundred thousand dollars ($100,000). This authority to remain good for sixty days. I will made a deed in fee, with general warranty, to the purchaser. M. H. Sullivan."

### Exhibit B.

### "Sullivan Timber Lands.

"Martin H. Sullivan, of Pensacola, Fla., is the owner in fee of two hundred and fifty thousand acres of long leaf yellow pine timber land, in the state of Alabama, situated in the following counties:

| | |
|---|---|
| County of Escambia | 156,000 acres |
| County of Conecuh | 42,000 acres |
| County of Monroe | 40,000 acres |
| County of Baldwin | 12,000 acres |
| Total | 250,000 acres |

"This land is in one body, beginning on the northern line of the state of Florida, in the county of Escambia, two and a half miles east of Flomaton Junction, on the Louisville & Nashville R. R. It runs north about 25 miles, into the county of Conecuh; thence west some 8 miles, into county of Monroe; thence south 6 miles; thence west 10 miles; thence south with the county line between Escambia and Baldwin to the Florida state line. Within this outline there are several one-quarter (¼) and one-half (½) sections in the different townships which do not belong to Sullivan. The 12,-000 acres in Baldwin county fronts on the Alabama river below old Fort Montgomery, and runs back east to the Escambia county line, connecting with the main body at that point. The great body of this land lies on the head waters of Escambia river, in Escambia county. On the east side the L. & N. R. R. runs through it from Flomaton Junction north to Selma, Alabama. On the south the L. & N. R. R. runs through it from Montgomery, Ala., to Mobile. It is about 50 miles by rail from Sullivan Mill, on this land, to Mobile, and about 45 miles from Flomaton by rail to Pensacola, Fla. The map accompanying this statement shows the position of these lands as marked thereon. The lands are all above overflow, and the timber on every acre is perfectly accessible. The timber on the land is what is known as the 'Long Leaf Yellow Pine'; the trees growing from 70 to 90 feet to the first limb, perfectly straight. The largest will square 12 inches, 70 to 80 feet from the butt. About 200,000 acres of this timber is practically virgin forest. The remaining 50,000 acres has been partially cut prior to 1892. Only the largest trees were cut then, leaving all under fifteen inches in diameter. These lands were carefully selected by Mr. Sullivan, who is a timber expert, having been engaged in the timber business about 40 years. His estimate is that the poorest lands will cut five thousand (5,000) feet, and the entire tract can safely be estimated at seven thousand (7,000) feet per acre; and Sullivan is not a man who will make an overestimate in this matter. On this land Mr. Sullivan has built three railroads of standard gauge, as follows: One road running from Sullivan station, on the L. & N. R. R., out eleven (11) miles through the forest to a former mill site; one from Wallace station, on the L. & N. R. R., some ten (10) miles out into the forest; and another branch from this line, six (6) miles. These lines were laid with 30-lb. rails, and were built to haul logs from the forest to the mills, and the timber from mills to L. & N. R. R., and thence to Mobile and to Pensacola. They were built in 1890 and 1891, and used during that time, but have not been in use since. The rails are in good condition, but the road is not. There are two mills and one mill site on these lands, as follows: One known as 'Wallace Mill,' situated on the L. & N. R. R., near Wallace station in Escambia county. This is a fine steam mill, built in 1891, and with all modern improvements, and cost $125,000. It was run less than 1 year, and is in perfect order, and, with the purchase of a new band, could be put to work at once. It has a capacity of 100,000 feet of timber per diem. It has every facility for handling logs and timber, and the output of this mill can be delivered by rail 55 miles to Pensacola, Fla. Another, known as the 'Pine Log Mill,' is situated in Baldwin county, near the

Alabama river. This is a water mill of about 35 to 40 thousand feet capacity per diem. It is in moderately good condition. Its output can be shipped down the Alabama river to Mobile, about 75 miles. A mill site known as 'Sullivan Mill' is situated in Escambia county, on the 11-mile branch road running from Sullivan station on the L. & N. R. R. Here is a magnificent boom, and every facility for handling logs and timber. There was a water mill here in 1891-2. The output from a new mill built at this point could be sent by rail to Mobile or to Pensacola. These improvements were put on this land by Mr. Sullivan in 1890-1, when he organized the Sullivan Timber Co., and with a view of carrying on the timber business on an extensive scale. The price of timber declined in '92 to such a point (being about $7.50 per thousand at Pensacola and Mobile) that he preferred to close up the business rather than cut his trees and sell timber at such rates. Since then the trees have been carefully preserved, and to-day the forest is intact. These lands were all high and dry, slightly undulating, good soil, and, where cultivated, produce excellent corn and cotton, and all the fruits of that climate, of fine quality. Lands in these counties, when cleared of timber, sell readily at from $4.00 to $6.00 per acre for agricultural purposes. The climate of this section is delightful, being, of course, mild in winter; and the summer heat is tempered by the ocean winds from the south. The health of these counties is unusually good.

"I consider the following figures as a safe, low estimate of the value of the timber on this land, and the value of the lands after the timber is cut:

| | |
|---|---|
| The poorest, 50,000 acres, at 5,000 ft. | 250,000,000 ft. |
| The other, 200,000 acres, at 7,000 ft. | 1,400,000,000 ft. |
| Making the total timber | 1,650,000,000 ft. |

"There are excellent locations on these lands, where four (4) new steam mills can be erected, on these railroads, of a capacity of 100,000 feet to each per day. These four, together with the two now on hand (changing the water mill into a steam mill), would put out 600,000 feet per day, or 15,600,000 feet per month of 26 working days, or 187,000,000 feet per annum. The present price of timber at Pensacola, Fla., and Mobile, Ala., is $16.50 per thousand. To cut these trees, haul them to the mills, saw into timber, load on cars, and deliver on wharf at Pensacola or Mobile, is less than $5.00 per thousand. These six mills can cut the entire timber from these lands in less than nine (9) years. But it cannot be expected that timber will remain at the present high figures more than a year or two. One can safely, however, count on timber continuing for many years at very remunerative figures. But for the next two years, by putting the 4 new mills in operation, the six mills can put out 187,000,000 feet per annum. This, delivered at Pensacola, will net certainly $10.00 per thousand, or $1,870,000 per annum. This shows the possibilities for the next two years at the present unusually high price for timber. It is proper to state here that the demand for timber at Pensacola and Mobile for foreign shipment is far beyond the output. Contracts can be made there with thoroughly reliable houses for timber for 6 to 8 months' delivery at present rates. These four new mills, of the capacity required, can be built to-day for $50,000 each. It is not necessary to erect so expensive a mill as the one now at Wallace.

"Turpentine. Another source of revenue from this timber, and one not to be overlooked, is turpentine. Contracts can be made with reliable parties to allow them to box these trees ahead of the cutters, so as not to injure them for timber, and from this source from $2.50 to $3.00 per acre can be obtained. None of this timber has ever been boxed. It is in the 'forest primeval.'

"Resale. If the purchaser of this land should desire to do so, this land can be sold off to great advantage in lots from 10,000 to 30,000 acres. Mr. Sullivan will not break his block up, but prefers to sell it as a whole or not at all.

"Stumpage. In this section of Alabama and Florida, stumpage is $2.00 per thousand. A purchaser of this land can sell as much stumpage as he cares

to at $2.00. **Mr. Sullivan** considers it a waste to sell it at such figures, and will not do so.

"These are the principal facts in connection with these lands.

"The price of the lands, with everything on them,—mills, mill booms, and railroads, is $1,500,000. Of this $500,000 in cash, and $1,000,000 will be carried on bond and mortgage at four per cent., with a proper sinking fund to retire the bonds when due, running, say, ten years. This land is free from all incumbrances, and a deed in fee, with general warranty, will be given the purchaser by Mr. Sullivan.

### "Wharf at Pensacola, Fla.

"In addition to this land, Mr. Sullivan owns a wharf at Pensacola, Fla., which is the principal wharf in the city. It comprises some seven acres, and is filled in with stone, and from eight to ten ocean-going vessels can load from the dock at one time. A double-track railroad belonging to Mr. Sullivan runs on this wharf, connecting with the L. & N. R. R., so that cars from the L. & N. can run on the wharf to a ship's side, and be unloaded from the car into the ship. There is also a large boom in connection with this wharf, into which timber can be unloaded to await arrival of vessels, and from there loaded into the ships. The price of this wharf is $100,000. It can be purchased in connection with the lands, or not, as the purchaser may desire. But together, these lands and wharf, with the mills in operation, make the most valuable property of this character in the Southern states. Sullivan's timber lands are well known in the South by all timber merchants, and are regarded as the pick of that section."

### Exhibit C.

"New York, Nov. 16th, 1899.

"Memorandum of agreement this day entered into by and between Martin H. Sullivan, of Pensacola, Fla., and W. D. Mann, of New York City, witnesseth: Martin H. Sullivan agrees to sell and convey by general warranty deed in fee, as hereinafter provided, his timber lands situated in the state of Alabama, in the counties of Escambia, Conecuh, Monroe, and Baldwin, comprising about two hundred and fifty thousand (250,000) acres, together with all mills, booms, and other fixtures now thereon; also railroads situated now on said lands in the county of Escambia; also the wharf property in the city of Pensacola, Fla., now known as 'Sullivan's Wharf,'—for the sum of one million six hundred thousand dollars ($1,600,000), upon the following terms and conditions, to wit: The said W. D. Mann is forthwith to select some one or more persons to go upon said lands and wharf and examine same, and make a report as to the amount of timber per acre on said lands, and value thereof; as to the number of mills and booms on same, condition and value; as to the railroads on same, condition and value; and as to the wharf property in Pensacola, Fla., its condition and value; also as to any and all matters upon which the said Mann may desire information in regard to said property. Said examination and report is to be made within sixty (60) days from this date. Upon the examination of said report, if it shall appear that the statements set forth in the written memorandum given to the said Mann as to said property are substantially correct, then the said W. D. Mann undertakes and agrees to cause to be organized, under the laws of the state of ———, a corporation, to be known as the ——— Company, with an authorized capital stock of $——— (to be fully underwritten at par by bona fide solvent underwriters), and with power to issue bonds for one million dollars ($1,000,000), with interest at four per cent. (4%) per annum, payable semiannually, and due and payable ten (10) years after date, with a sinking fund of ten per cent. (10%) per annum, to be paid in redemption of said bonds, and to cause said company, when organized, to purchase from Martin H. Sullivan said lands, mills, booms, railroads, and wharf property for the sum of one million six hundred thousand dollars ($1,600,000), to be paid as follows: Five hundred thousand dollars ($500,-000) to be paid in cash, and one million dollars ($1,000,000) to be paid in the authorized bonds of said company, due and payable as above set forth, and fully secured by a first mortgage on all the lands, mills, railroads, wharfs,

113 F.—7

and other property of said company, and one hundred thousand dollars ($100,000) to be paid in the shares of the capital stock of said company at par. The said Martin H. Sullivan agrees and contracts to convey by deed in fee, with general warranty, the said two hundred and fifty thousand (250,000) acres, more or less, of timber lands, together with the mills, booms, railroads, and all other fixtures now thereon, and the wharf in Pensacola, Florida, to the said company, and receive payment for same as above set forth. This agreement is to be fully executed within ninety (90) days from this date. Witness our hands and seals in this sixteenth day of November, 1899.                                                        M. H. Sullivan.
                                                                   "W. D. Mann.

"Witness in presence of:
   "W. A. Milliken.
   "F. W. Weeks."

The defendant, Sullivan, demurred to the declaration, and as grounds of demurrer assigned the following: "(1) It is alleged in said count that the plaintiff was employed to sell the property of defendant, and it is not alleged that any sale was ever made. (2) It is alleged in said count that the plaintiff was employed to sell the property of defendant, and it is not alleged that any sale was ever consummated, or that it failed of consummation by the fault of the defendant. (3) It is alleged in said count that the plaintiff was employed to sell the property of defendant, and it is not alleged that any sale was ever made, but only that a contract was made for a sale; and it is not alleged that any sale resulted from said contract, or that the parties contracting to buy were able to do so, or that the sale failed of consummation by reason of any fault of defendant. (4) It is alleged that the plaintiff was employed to make a sale, and it is only alleged that a contract of sale was made; but it is not alleged that any sale was made, or that it failed to be made on account of any fault of defendant. (5) It is not alleged that any sale was made within sixty days from October 12, 1899." The circuit court overruled the demurrer. The case went to trial on pleas that were filed, and resulted in a verdict and judgment for the plaintiff, Milliken, for $77,890.70. The defendant, Sullivan, brings the case to this court on writ of error, and assigns that the circuit court erred in overruling the demurrer to the declaration. The view we take of the case makes it unnecessary to state and decide the many other exceptions and assignments of error contained in the record.

Thomas H. Watts, H. Bisbee (John B. Jones, F. G. Caffey, and Alexander Troy, on the brief), for plaintiff in error.

W. A. Blount, W. W. Howe (A. C. Blount, Jr., on the brief), for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Did the circuit court err in overruling the demurrer to the declaration? This is an action by a broker against his principal for commissions for selling real estate. The declaration should contain a statement of facts which entitles the plaintiff to recover. No fact material to recovery should be left to inference. By considering what it is necessary for the plaintiff to prove in such case, we ascertain what must be alleged in the declaration. The issues to be tried involve the questions: (1) What did the broker undertake to do? (2) Has he completed the undertaking within the time and upon the terms stipulated? (3) If not, is his failure attributable to the fault or interference of the principal? If on investigation it be determined that the broker has performed his contract within the

time and upon the terms agreed on, he is entitled to his commissions. If he has not, he has earned no commissions, unless performance by the agent was prevented by the fault or wrong of the principal. To entitle him to recover, he must prove, and therefore he must allege, (1) that he was employed as an agent or broker to sell the property; (2) that he sold it at the price and on the terms fixed by his principal, or on other terms agreed to by him, or that he found a purchaser ready, willing, and able to buy the property at the price and on the terms fixed or agreed to by the principal; and, if the sale was not made, that the failure to conclude the same was caused by some fault of the principal. The undertaking of the plaintiff was to sell the property. This is specifically averred, and the written authority to sell is made Exhibit A to the declaration. Addressing the plaintiff, the defendant wrote:

"I hereby authorize and empower you to sell my pine timber lands," etc. (briefly describing the property and stating the price). "This authority to remain good for sixty days. I will make a deed, with general warranty, to the purchaser."

The plaintiff acted under this authority. His undertaking, therefore, was, clearly, to sell. The plaintiff, having been employed to sell the property, prepared, at the request of the defendant, an elaborate description of it. In this prospectus he estimates the number of acres; describes the booms, sawmills, and railways; states the value of the timber on the land, the amount of lumber that could be put on the market from the lands, and states the several sources of revenue from the lands. This estimate and description is made a part of the declaration, as Exhibit B. It tends to show the property to be worth much more than the price asked for it. It is not alleged that the defendant was in any way responsible for its contents. He did not sign it. He did not sign any agreement alleging that the statements of this memorandum are true. It is only referred to in the contract between the defendant and Mann as "a written memorandum given to the said Mann." There is no averment that Sullivan gave Mann the memorandum, or that Sullivan knew of its contents. This memorandum was made by the plaintiff, and no fact is alleged that would make the defendant responsible to the plaintiff for the truth of its statements. If the declaration can be construed to make Sullivan responsible to Mann for the truth of the prospectus, it certainly cannot be held, on its averments, that he ever represented to Milliken that the prospectus was true. Milliken, it is averred, and not Sullivan, is its author. It is the plaintiff's handiwork. There is no claim asserted in the declaration that a sale was prevented by the wrong or interference of the defendant. The case, therefore, depends on the allegation as to performance on the part of the broker. It is not alleged that the plaintiff sold the property. It is not alleged that he found a purchaser ready, willing, and able to buy the property. As a substitute for these averments, usual in suits by brokers to recover commissions, the plaintiff alleges that:

"In pursuance of the said employment the plaintiff procured that the defendant and one W. D. Mann should and did on November 16, 1899, enter

into a written contract by which the defendant agreed to convey the property mentioned in the written authority and memorandum hereinbefore set forth as Exhibits A and B [which memorandum is the memorandum referred to in the said written contract] to a corporation to be organized by the said Mann as set forth in the said agreement, and the said Mann agreed to cause the said corporation to be organized, and to pay to the defendant for the said property five hundred thousand dollars in cash, one million dollars in the first mortgage bonds, and one hundred thousand dollars in the stock, of the said company, all of which is set forth in the said agreement, which is hereby referred to, and, as Exhibit C, hereto attached and made a part hereof for greater particularity and exactness."

The plaintiff, therefore, bases his right to recover on the fact that he procured Mann to make a contract with the defendant on November 16, 1899. The claim is that the plaintiff is entitled to the commissions sued for, because he procured Mann to make this contract. If his contention is well founded, his right to the commissions accrued as soon as the contract was made. There is no averment as to what followed the making of the contract. The case made by the declaration ends with the signing of the contract. It is not alleged otherwise that Mann became the purchaser of the property. The agreement is made a part of the declaration. Reading it, we find that it is clearly binding on Sullivan to sell if Mann finally agrees to buy. But it clearly does not bind Mann unconditionally to purchase. Mann agrees "forthwith to select some one or more persons to go upon said lands and wharf and examine the same, and to make a report as to the amount of timber upon said lands, and the value thereof. * * * Upon examination of said report, if it shall appear that the statements set forth in a written memorandum given to the said Mann as to said property are substantially correct," then, and in that event only, Mann agrees to organize a corporation to buy the property on terms stated in the contract. The contract as to Mann is tentative, his acceptance being dependent on the result of an investigation to be made in 60 days. Can it be true that, as soon as this contract was signed, the plaintiff, who was employed to sell the property, was entitled to commissions, whatever the person or persons selected to examine the property might report? If the prospectus was untrue, was he entitled to commissions? Has he earned the commissions, under an employment to sell, by preparing a prospectus showing the great value of the property, and finding a customer who agrees to take the property if the description and estimated values are substantially correct? Did Sullivan, when he signed the contract with Mann,—a contract not binding on Mann unless Mann's investigations confirmed Milliken's prospectus,—become indebted to Milliken for commissions on the agreed price? Consider the question in this way: The authority which Sullivan gave Milliken to sell the property, of course, authorized him, as Sullivan's agent, to make a written offer to sell it. Except for the changes as to the terms of sale, he might well have signed as agent for Sullivan the contract with Mann. Now, if he had signed an agreement binding his principal to convey the land to Mann on the terms and at the price named in his authority, and Mann had agreed to buy the land, if, on the report of experts to be appointed to examine it, it was found

that the prospectus prepared by Milliken was substantially correct, would Milliken be entitled to commissions, as on a sale, whether Mann completed the purchase or not? Whether the land was examined by the experts or not? Whether the descriptions and estimates prepared by Milliken were true or not? We cannot think he would have earned his commissions by making such contract. To so hold would give the agent great advantage of his principal, and would encourage him to exaggerate the value of the property in his dealings with customers. If he was reckless in his descriptions and extravagant in his valuations, he might easily find a customer to contract to buy the property if it was found to be as valuable as the agent said it was. Such performance, surely, would not entitle him to commissions.

To show that the contract is binding on Mann, it is said that Sullivan could recover damages for the failure by Mann to complete the purchase. This proposition need not be examined further than to say it is clear that such damages could not be recovered without alleging and proving that the prospectus prepared by Milliken was substantially correct, or at least that the persons appointed to examine the property reported it so. An action for damages might lie on the averment that it was Mann's duty to appoint persons to examine the property, and that he failed to do so, and that the prospectus was substantially correct. But the declaration in question contains no averment of fact which shows that a recovery could be had in damages by Sullivan in a suit against Mann for a breach of the contract.

It is also said that the contract in this case was one of sale, because it could be specifically enforced. The question on this suggestion here is, could it be specifically enforced against Mann, admitting the averments of the declaration to be true? That it is a contract to sell that could be enforced by Mann against Sullivan, if Mann performed his part of the contract, may be admitted. Sullivan bound himself to convey. But Mann has not bound himself unconditionally to purchase. He stipulates for time to have the property examined, and agrees to purchase only in the event that it is found to conform to the prospectus. When it appears by the contract, in its express terms, that it was intended to be binding upon one of the parties alone, it may be specifically enforced against that party, although the remedy cannot be granted to him against the other party. Pom. Cont. § 169. The declaration in this case does not describe a contract for which Sullivan would have a remedy in equity for specific performance. Mann agreed to buy on condition that the prospectus was shown to be substantially correct, and there is no averment that it is correct. Unless the property met this requirement, there was no "true contract" of sale. Id. § 334. The prospectus not being substantially correct, the contract would not bind Mann, or at least he could revoke it. A court of equity will not enforce specific performance against a party who has the power of revocation. Southern Exp. Co. v. Western North Carolina R. Co., 99 U. S. 191–200, 25 L. Ed. 319. The contract pleaded is not a completed sale, and, on the facts averred in the declaration, it is

not a contract that Sullivan could specifically enforce against Mann. Mayer v. McCreery, 119 N. Y. 434, 23 N. E. 1045. The declaration shows nothing done by Milliken to earn a commission, except to procure the making of the contract with Mann. To show a legal claim to commissions, it must allege a completed sale, or an enforceable agreement for sale. Hammond v. Crawford, 14 C. C. A. 109, 66 Fed. 425; Jacobs v. Shenon, 2 Idaho, 1002, 29 Pac. 44. Securing a preliminary or tentative agreement not shown to have resulted in a complete sale, and not binding on the proposed purchaser, is not sufficient. Hale v. Kumler, 29 C. C. A. 67, 85 Fed. 161. In such cases nothing should be left to conjecture or speculation. "There should have been as much certainty on the one side of the contract as upon the other. * * * The broker must complete the sale (that is, he must find a purchaser in a situation, and ready and willing, to complete the purchase on the terms agreed on) before he is entitled to his commissions." McGavock v. Woodlicf, 20 How. 221, 227, 15 L. Ed. 884. The declaration states that the plaintiff, at the request of the defendant, "prepared a written memorandum describing the property." The action, however, is not for such service. The declaration, we think, is properly construed in that respect by the learned attorneys for the defendant in error, in their printed argument, when they say this is an action "to recover $100,000 commissions alleged to have been earned by Milliken by selling," etc. We have so considered it. The services were performed under a special employment to sell, and no right to recover on the quantum meruit is asserted.

Tested by these principles and authorities, the declaration does not show a right of action against the plaintiff in error, and the demurrer to it should have been sustained.

The judgment of the circuit court is reversed, and the cause remanded, with instructions to set aside the verdict of the jury, sustain the demurrer to the declaration, and to grant a new trial, proceeding according to law and the views herein expressed. Reversed.

McCORMICK, Circuit Judge. I agree with my Brethren that the judgment of the circuit court in this case should be reversed, and the cause remanded to that court, with direction to award the defendant a new trial; but I am unable to agree with them in the ground on which they base the decision of the court. I do not construe the thirteenth count in the declaration as an action to recover compensation stipulated for in a written contract. Exhibit A, attached to that count, makes no mention of compensation. It simply authorizes and empowers the plaintiff to sell certain property of the defendant at a price named. Exhibit B shows only some of the services rendered by the plaintiff to the defendant; and Exhibit C helps to show further the services rendered by the plaintiff, and accepted and acted on to the extent therein shown by the defendant. And the count claims that, in pursuance of his employment, the plaintiff procured that the defendant and one W. D. Mann should and did on November 16, 1899, enter into a written contract by which the defendant agreed to convey the property mentioned in the writ-

ten authority and memorandum set forth as Exhibits A and B, which contract of November 16, 1899, is the Exhibit C attached to the count; and the plaintiff avers that by reason of the premises he became entitled to demand and receive from the defendant, and the defendant became obliged to pay to the plaintiff, for his services aforesaid, a large sum of money, to wit, the sum of $100,000. How this can be construed as other than demanding the reasonable compensation for the services shown to have been rendered, I confess my inability to understand.

The twenty-fourth error assigned is, in my judgment, well taken. It is thus stated in the record:

"Twenty-Fourth Assignment of Error. After the jury had rendered their verdict, to wit, 'We, the jury, find for the plaintiff in the sum of thirty-one thousand nine hundred and fifty dollars, less six thousand nine hundred and fifty credit, with New York interest,' and after the jury had been polled, and each had said that it was his verdict, and after the said verdict had been read and ordered to be received, and after the other proceedings shown in the bill of exceptions, the court said to the jury: 'Gentlemen of the Jury: In this case you have found for the plaintiff, and you have found against the pleas of the defendant. You have found that the plaintiff has a right to recover. The court charged you that the only testimony.—charged you heretofore. and now I repeat, that the only testimony before you bearing, as I recollect it, upon the question of amount, was the testimony of Mr. Milliken, to the effect that in New York City, where the transaction took place, the customary and usual percentage was from five to ten per cent. on the full face value of the one million six hundred thousand dollars, and that he had agreed to take that amount as his compensation,—the amount of five per cent. You will take the case, gentlemen.' The defendant then and there, before the jury retired, excepted to the said action of the court. This assignment is on the ground that after the jury had rendered their verdict, and said verdict had been received by the court and ordered recorded, the court had no authority to again submit the matter to the said jury, or to charge them concerning their verdict."

And on this ground I concur in the judgment of reversal. Taken in connection with the other proceedings shown by the bill of exceptions to have been had at the time, the instruction was equivalent to the general charge to find for the plaintiff on the merits, and to render their verdict for 5 per cent. commissions on $1,600,000, viz., for $80,000, less the admitted credit. The jury so understood it, and returned their verdict accordingly:

"We, the jury, find for the plaintiff in the sum of $80,000, with interest from the commencement of this suit, less the sum of $6,950, with interest from January 8, 1900."

This shows clearly the taking of the case entirely from the jury, and substituting for their verdict the finding of the court.