WATSON v. ODELL et al.

No. 3576.    Decided May 5, 1921.    Rehearing Denied June 24, 1921.
(198 Pac. 772.)

1.    BROKERS—PLAINTIFF HELD NOT TO HAVE EARNED COMMISSION ON PENDING SALE WITHIN DEFENDANT'S OFFER.    Where defendants had offered to pay plaintiff a stated commission out of the proceeds of a pending sale by a corporation to purchasers procured by plaintiff, proof that the purchasers and the corporation did not enter into a contract of sale, but that defendants, who were stockholders' entered into a contract with the purchasers for the sale of bonds to be issued by the corporation, which transaction was never consummated because of failure of the purchasers' attorney to approve the contract, does not show that plaintiff had earned the commission which defendants agreed to pay.

2.    SALES—ORDINARILY "SALE" MEANS TRANSFER FOR MONEY.    A "sale" is ordinarily understood to mean a transfer of property for money.

3.    BROKERS—CANNOT RECOVER ON QUANTUM MERUIT.    In view of the statute requiring a contract for commission to be in writ-

ing, a broker can recover a' commission only by virtue of a contract, he cannot recover on a quantum meruit.[1]

4.  BROKERS—BROKER EMPLOYED BY SPECIAL CONTRACT PROVIDING FOR PAYMENT FROM PROCEEDS OF SALE CAN ONLY RECOVER THEREUNDER AND CANNOT RECOVER FOR PROCURING PURCHASER.  A broker who was employed by a special contract to sell the property of an irrigation company for a stated commission to be paid from the proceeds of the sale can recover only under his special contract, and cannot recover for procuring a purchaser ready, willing, and able to buy or with whom his principal made the contract, as would be the case if his employment were general.

5.  BROKERS—SPECIAL CONTRACT FOR STATED COMMISSION AT FIXED PRICE DOES NOT AUTHORIZE PERCENTAGE COMMISSION ON SALE AT LESS PRICE.  A broker employed by a special contract to sell the property at a stated figure for a fixed commission, not a percentage of the sale price, is not entitled to the agreed commission nor to a proportionate commission on a sale at a less price.[2]

6.  BROKERS—NOT ENTITLED TO COMMISSION WHERE CONTRACT WITH PURCHASERS REQUIRED APPROVAL OF ATTORNEYS, WHO REFUSED TO APPROVE THE SAME.  A broker is not entitled to a stipulated commission for negotiating a sale of property at a fixed price where the contract between his principal and the purchasers required the approval of the purchasers' attorney, and the attorney refused to give such approval.

Appeal from District Court, Third District, Salt Lake County; *Wilson McCarthy,* Judge.

Action by Edward H. Watson against George T. O'Dell and others to recover a commission for procuring a purchaser for the property of an irrigation company. Judgment for defendants, and plaintiff appeals.

AFFIRMED.

See, also, 53 Utah, 96, 176 Pac. 619.

---

[1] *Case* v. *Ralph,* 56 Utah, 243, 188 Pac. 640.

[2] *Little* v. *Fleishman,* 35 Utah, 566, 101 Pac. 984, 24 L. R. A. (N. S.) 1182; *Fritsch* v. *Hess,* 49 Utah, 75, 162 Pac. 70.

*Ball, Musser & Robertson,* of Salt Lake City (*Ogden Hiles,* of Salt Lake City, of counsel), for appellant.

*Dey, Hoppaugh & Mark, Walton & Walton,* and *Ray & Rawlins,* all of Salt Lake City, for respondents.

WEBER, J.

The averments of the complaint are in substance (1) That on and prior to June 15, 1915, the Richlands Irrigation Company was a Utah corporation; (2) that the corporation owned certain water rights and real estate, consisting of an option to purchase 20,000 acre-feet of water from the Deseret Irrigation Company, a preference right under the Carey Act of 10,800 acres of land in Millard county, and certain water rights and reservoir sites; (3) that the Richlands Company represented to plaintiff that it desired to sell its holdings to any one who would pay $260,000 for them; (4) that defendants employed plaintiff to find purchasers ready, able, and willing to purchase the same, and promised to pay plaintiff $30,000 commission for his services; (5) that plaintiff procured certain persons ready, able, and willing to purchase the property defendants had for sale and brought the sellers and prospective purchasers together, and that the persons so found by plaintiff "offered to purchase from said Richlands Company the property it desired to sell as aforesaid at the price at which it had proposed to sell to the plaintiff"; (6) that after various conferences between the proposed purchasers and defendants these defendants proposed to the purchasers that, instead of conveying the land and water rights and having the consideration therefor paid to the corporation, it would be better to adopt the scheme proposed in the triparty agreement of May 20, 1916, attached to the complaint as Exhibit A; that as part of the transaction embodied in Exhibit A, dated May 20, 1916, "in consideration of the contract which he [plaintiff] had theretofore made with said corporation and of his rights thereunder, and of his services in procuring said proposed purchasers,"

the individual defendants agreed with plaintiff to pay him $30,000 as a commission; (8) that the proposed purchasers, after making the contract aforesaid, continued at all times, ready, able, and willing to comply with the terms of the contract and to pay defendants the sum of $260,000, but defendants failed, neglected, and refused to procure the Deseret Irrigation Company to transfer and deliver to the Richlands Company, refused to secure the execution by the State Land Board of a Carey Act contract, failed to cause the Richlands Company to issue bonds, and was therefore unable to comply with the terms of its contract with the purchasers. Exhibit A, which is attached to the complaint, and is also found in the bill of exceptions, was executed May 20, 1916, with George T. Odell, D. B. Macintosh, and W. C. Alexander as parties of the first part, the Deseret Irrigation Company, a corporation, party of the second part, and Ernest Shields, George T. Franck, Robert P. Franck, and Thomas C. Hickman, of San Diego, Cal., the proposed purchasers, parties of the third part. The first parties agree: First, to cause a certain agreement between second parties and the Richlands Company, as modified, to be ratified, adopted, and confirmed by resolution of the board of directors of the Richlands Company; second, to secure within 30 days from date the execution by the State Board of Land Commissioners of Utah a Carey Act contract between the state of Utah and the Richlands Company in form satisfactory to the legal firm of Story & Steigmeyer, of Salt Lake City, substantially in the form of Exhibit B, attached to the agreement, and to cause the Richlands Company's board of directors to adopt a resolution authorizing and directing the proper officers of the corporation to execute said Carey Act contract on its part, "provided first parties shall not be liable for breach of this covenant if they make an effort in good faith to obtain such a contract from the state and are unable to accomplish such purpose"; third, to cause said Richlands Company to issue its 6 per cent. bonds dated July 1, 1916, in the sum of $300,000, payable in 10 series, one of which shall mature July 1, 1917, and one annually thereafter and to secure said

bonds by mortgage or deed of trust in favor of Columbia Trust Company, of Salt Lake City, Utah, as trustee, upon all the assets and property of the company; fourth, to cause the Richlands Company to purchase all of its outstanding stock except 5,000 shares of preferred stock and 5 qualifying shares of its directors for the consideration of $80,000, payable: (a) $13,300 cash; (b) the promissory note of the Richlands Company payable to W. C. Alexander as trustee, secured by pledge of bonds of said first series, for $12,600; (c) serial bonds of the Richlands Company to be issued aggregating $49,100. ''Second party agrees to extend each payment on contract of January 10, 1916, and the contract referred to is otherwise changed and modified. Third parties agree that within five days after first parties have fully performed the covenants by them to be kept and performed to the satisfaction of said Story & Steigmeyer they will purchase and pay for in cash at par bonds of the Richlands in the aggregate principal amount of not less than $28,000, of which $25,000 shall be used for making the cash payments to first and second parties.''

Attached to the agreement is a form of state land contract, paragraph 16 of which provides that, if within one year from the execution of the contract the State Engineer shall determine and first party (the state of Utah) shall so notify second party (Richlands Company) that a drainage system is necessary for the reclamation of the lands of said segregation, then within the period fixed in the contract for the construction of works second party shall construct such drainage system according to the specifications approved by the State Engineer of Utah.

The defendants answered the complaint, and after admitting the matters of inducement, and that certain contracts had been entered between plaintiff and defendants, denied all other allegations in the complaint.

Upon these issues a trial to the district court, sitting without a jury, resulted in findings against plaintiff's contentions and in favor of defendants, upon which judgment was duly entered from which plaintiff appeals.

On March 7, 1916, plaintiff and the Richlands Company entered into a written agreement by which all former agreements and extensions thereof between plaintiff and the Richlands Company relating to the sale of the project were cancelled. It was stipulated that the following commission contract would be recognized "so long as the Richlands Irrigation Company deals with the late J. D. Mollison's associates under extensions granted said Richlands Irrigation Company by the Deseret Irrigation Company." The sale price of the property and assets of the Richlands Company was fixed at $260,000, payable as follows: $25,000 cash; $40,000 with 6 per cent. interest on or before one year from date of first payment; $195,000 in nine equal installments with interest on whole amount unpaid to be paid annually, commission to Watson (plaintiff herein) to be $30,000, payable $10,000 out of the first cash payment of $25,000, $5,000 out of second payment of $40,000, $5,000 out of each of the third, fourth, and fifth installments when paid. It was further provided that in event of the sale of the Richlands project (not including contract for purchase of Deseret water) to the late J. D. Mollison's associates the following price and commission would be recognized: Price, $67,500, with 6 per cent. interest on all deferred payments, from which a commission of $12,500 would be paid from the installments paid, pro rata as made.

On May 10, 1916, the plaintiff and the individual defendants W. C. Alexander, A. L. Hoppaugh, C. L. Cundick, R. E. Mark, D. B. Macintosh, and George T. Odell entered into a written agreement with plaintiff as follows in substance:

"In the event of the closing of the pending sale of the Richlands Irrigation Company's holdings to Mr. Shields and his associates from California, we, the undersigned, stockholders of the Richlands Irrigation Company, hereby agree to pay you as commission the sum of $30,000.00, said amount to be paid as follows: $10,000.00 out of the first payment of $25,000.00 and $5,000.00 out of each of the following four payments as they are respectively made."

The contract of May 20, 1916, being Exhibit A of the

complaint, was introduced in evidence by plaintiff. The contract referred to was ratified and approved by the board of directors of the Richlands Company and also by the stockholders of that corporation.

On June 23, 1916, Shields and his associates wrote to Moody, Alexander & Watson saying they had had a conference with Mr. Steigmeyer and understood that the deal was off, and that, as the deal seemed to have fellen down, they demanded reimbursement for the costs and expenses to which they had been put.

A letter dated July 1, 1916, from George T. Odell, one of the defendants, to the secretary of the State Land Board, was introduced in which he spoke of two plans that had been before the Land Board regarding the Richlands project. He said he had always been in favor of adopting the first plan, which involved an expenditure of $100,000 or less, while the second plan would mean an expenditure of $300,000 or $400,000. He also said that, inasmuch as the delay beyond the 15th of June has "put our San Diego friends" in a peculiar mood, "which, I judge from our correspondence received, has caused them to waiver and so it may be possible that they will call their side of the deal off, which they have a right to do áfter the 15th of June," and he suggested that no additional work be commenced or expense incurred until officially advised by the Richlands Company.

On this record, together with other evidence that will be referred to hereinafter, plaintiff demanded judgment for $30,000.

The controlling question in this controversy arises out of the letter of May 10, 1916, signed by the individual defendants, who therein agreed to pay plaintiff $30,000 out of expected payments "in the event of the closing of the pending sale of the Richlands Irrigation Company's holdings to Mr. Shields and his associates from California."

What is meant by pending sale? The only price at which plaintiff had been authorized sell was $260,000, with a commission of $30,000, as shown by the company's contract of March 7, 1916, with plaintiff. The record is devoid of any

proof that as a part of the scheme of May 20 the individual defendants, by their agreement of 10 days before, agreed to pay plaintiff $30,000. They agreed to pay $30,000 out of payments when made, and that the money due plaintiff should be paid to a trustee to be named by him. These individual defendants agreed that at the termination of the pending sale plaintiff should receive the commission of $30,000 in the amounts and at the times specified in the sale contract for $260,000. Appellant insists that the defendants had the triparty agreement of May 20th in mind when the contract of May 10th was entered. That is an inference that is not warranted by the evidence. No proof was produced that any sale was pending except the one plaintiff was authorized to negotiate for $260,000. Nor was there any proof that these individual defendants, or any of them, were then engaged with Shields and his associates in the negotiations which culminated in the agreement of May 20th. Plaintiff himself testified that he wanted the contract of May 10th for his own protection, and that at the time it was made he thought the sale was for $260,000.

The fact that a sale for a definite amount of money is mentioned in the agreements of March 7th and May 10th indicates that no such cumbersome, conditional, and unenforceable contract as that of May 20th was in contemplation of the individual defendants when they signed the agreement of May 10, 1916. A sale is ordinarily understood to mean a transfer of property for money. Pope, Legal Definitions, 1437. Ultimately the contract of May 20th, if successfully consummated, would eventuate in the receipt of money by the stockholders, but nevertheless it is fanciful and far-fetched to speak of the agreement as a sale. Assuming that plaintiff was employed by the individual defendants by the contract of May 10th, that, nevertheless, was not a general employment. Both by the contract of March 7th and the correlated agreement of May 10th his employment was special, on definite, special terms—a definite sale price of $260,000; a definite commission of $30,000 payable pro rata as the purchase price would be paid. No com-

mission was payable except in the event of the consummation of a sale, and no commission was payable except as the purchase price was paid. These contracts required more from the plaintiff than merely to find purchasers able, willing, and ready to buy. The actual payment of the purchase price was required, and only as the purchase price was paid were the commission installments due and payable.

In his complaint plaintiff alleges that he was employed by the Richlands Company to find a purchaser for the Richlands holdings at $260,000, and that both the corporation and the individual defendants agreed to pay him a commission of $30,000. He further pleads that he procured persons ready and willing to buy and able to pay $260,000. The allegation as to having procured purchasers or persons able, willing, and ready to buy, has no support in the record unless entering into the contract of May 20th and the statement therein contained that the parties of the third part were "ready and willing to purchase stock and other securities of the said Richlands Irrigation Company on the terms hereinafter stated" be accepted as evidence that the third parties were able and willing to buy the Richlands property for $260,000. If plaintiff had furnished such persons and defendants had refused to deal with them or had insisted upon some other terms, plaintiff might be entitled to pay for his services. But there is no such evidence.

The contract of March 7th was signed by the corporation alone; that of May 10th by the stockholders; the contract of May 20th by Odell, Macintosh, and Alexander, evidently acting for the company. Under our statute, the plaintiff could recover a commission only by virtue of a contract. He could not recover as upon a quantum meruit. *Case* v. *Ralph*, 56 Utah 243, 188 Pac. 640. Moreover, the $30,000 was to be paid only out of the proceeds of the sale when received. There never were any proceeds for a sale. Whatever plaintiff's rights to payment for services may be, he cannot, under the evidence in this case, recover on his special contract, because he never complied with the terms of that contract.

Nor does the evidence justify the inference that defendants, or any of them, refused to proceed with the contract of March 7th, or that they preferred the triparty agreement to a $260,000 sale.

Plaintiff must therefore rely upon his special contract, not upon a general employment.

The line of demarcation between the principles applying to the rights of a broker under a special contract and to his rights under a general employment is clear and distinct. As stated in *Karr* v. *Moffett*, 105 Kan. 692, 185 Pac. 890:

"The ordinary rule that a real estate agent is entitled to his commission when he procures a purchaser who is ready, willing, and able to buy, or when he brings a buyer and seller together who make a bargain on different terms than those theretofore dictated to the agent, does not apply when the agent's commission is governed by a special contract between him and his principal."

In the opinion on rehearing of *Karr* v. *Moffett*, 106 Kan. 379, 187 Pac. 683, the Supreme Court of Kansas said:

"Appellee sued for an ordinary real estate dealer's commission, alleging that he had earned it in the usual way. * * * The proof of existence of the special contract was surely an effective way of disproving that the defendants owed the plaintiff for services under an ordinary real estate dealer's contract, such as would entitle the agent to the usual commission when he had brought buyer and seller together, whereby they consummated a sale on terms agreeable to each other, 'when he had been the procuring cause of the sale,' as the stock phrasing in such cases is expressed."

In *Murphy* v. *W. & W. Live Stock Co.*, 26 Wyo. 455, 189 Pac. 857, it is said:

"Where, by the contract of employment, the commission is made dependent upon certain conditions or contingencies, as upon the actual consummation of a sale, or the full payment of the purchase money, or a specified part thereof, such as an agreed first payment, or a net price to the owner, these stipulations will govern, and a fulfillment of performance of the prescribed conditions is generally essential to the right to compensation."

In *Lindley* v. *Fay*, 119 Cal. 239, 51 Pac. 333, it is said:

"The evidence * * * tends to show an agreement to pay commissions out of the first money received, and no money has ever been received. Under such a contract, the broker is not entitled to compensation when he finds a purchaser ready, willing,

and able to purchase on the prescribed terms. There must be a sale and a first payment to entitle him to recover. It is so nominated in the bond."

Under the contract of March 7th the commission was to be paid out of proceeds of sale when received, and unless a payment be made no commission would be due. "It is so nominated in the bond."

In *Clark* v. *Asbury* (Tex. Civ. App.) 134 S. W. 286, a broker sued upon an express contract. He produced a customer able and willing to buy upon different terms. Holding that the broker must recover, if at all, upon the written contract sued upon, the court said:

"In *O'Brien* v. *Gilliland*, 4 Tex. Civ. App. 40, 23 S. W. 244, where the contract with the broker was to sell for cash, and he produced a customer who was willing to buy the land and pay one-half cash and execute vendor's lien notes for the remainder, and the broker had arranged to sell these notes for cash, it was held that this was not a sale in compliance with his contract to sell for cash.

"In *Thornton* v. *Stevenson*, 31 S. W. 233, it was held that, where a broker was to sell property at a certain price and discussed the sale with a party who afterwards purchased from the owner at a different price, he could not recover his commissions in a suit on his contract. In a suit for commissions on a contract, the recovery must be confined to the contract itself. *Edison* v. *Saxon*, 30 S. W. 958, 959. These are sound propositions of law, and a broker who sues upon a contract, and not upon quantum meruit, cannot recover unless he shows compliance with the contract, or unless he was prevented from carrying out the same by the seller. *Owen* v. *Kuhn, Loeb & Co.*, 72 S. W. 432. Giving an agent exclusive agency does not, of itself, preclude the owner from making a sale. *J. I. Case Threshing Machine Co.* v. *Wright Hardware Co.*, 130 S. W. 729; *Dole* v. *Sherwood*, 41 Minn. 535, 43 N. W. 569, 5 L. R. A. 720, 16 Am. St. Rep. 731. And if the owner make a sale upon other and different terms from those set forth in his contract with the agent, it cannot be said that the agent has made a sale in compliance with the terms of said contract; and if in such case he is entitled to any compensation, it must be upon quantum meruit, and not upon contract."

See, also, *Murray* v. *Rickard*, 103 Va. 132, 48 S. E. 871; *Edwards* v. *Baker*, 39 Cal. App. 755, 180 Pac. 33; *Columbia Realty Co.* v. *Alameda Land Co.*, 87 Or. 277, 168 Pac. 64, 440; *Cremer* v. *Miller*, 56 Minn. 52, 57 N. W. 318; *Van Norman* v. *Fitchette*, 100 Minn. 145, 110 N. W. 851.

It is argued that the price fixed in the March contract was only a basis for future negotiations between the owner and the purchasers. If the selling price was only a basis for future negotiations, why would not the $30,000 mentioned as a commission be 'equally subject to fluctuation? Would a sale for $30,000 entitle the broker to the whole amount as a commission? But the contract is definite as to the sale price. It plainly says the price is $260,000 out of which the stipulated commission of $30,000, not a percentage, shall be paid. *Toulminn* v. *Miller,* 3 Times Rep. 836, an English case cited by appellant's counsel, seems to uphold their contention, but, as the facts are not stated in the opinion, what seems to be obiter dictum to the effect that ''the mention of a specific sum  *  *  *  is merely given as the basis for future negotiations, leaving the actual price to be settled during the course of the negotiations,'' is not persuasive, and if on authority of that case it is claimed that under such a contract as that between plaintiff and the Richlands Company the price is merely a basis for future negotiations, we do not agree with the proposition thus advanced.

In *George* v. *Howard,* 4 D. L. R. 257, the contract was that Howard, the seller, would sell his hotel, except personal effects and stock, for $40,000, and pay George, the agent, 5 per cent, commission. The court held that as a matter of interpretation, ''in the light of the surrounding circumstances,'' the contract was not to pay a commission on $40,000, but on the ''purchase price,'' whatever that might ultimately be fixed at, accompanied by a statement that the basis of the negotiation was to be a price of $40,000. Plaintiff secured a purchaser for $34,000. This amount was accepted by the owner, the sale completed, and the broker was held entitled to the 5 per cent. commission.

In the case of *Little* v. *Fleishman,* 35 Utah, 566, 101 Pac. 984, 24 L. R. A. (N. S.) 1182, is announced the general rule that, when the broker procures a purchaser ready, able, and willing to buy for the price and on the terms satisfactory to his employer, he·did all that was required of him. The broker's contract in *Little* v. *Fleishman,* supra, shows the

inapplicability of that case to any question involved in this controversy. The proposition that was submitted by Fleishman, the employer, to Little & Little, the brokers, was this:

"You are given exclusive authority to sell for me the following property," situated in Salt Lake City, "for the sum of $33,000.00, upon the following terms, to wit: $25,000.00 cash, balance thirty days. In the event of a sale at any price agreed upon I agree to pay the regular commission, which is five per cent. on amounts up to $2,500.00 and one and one-half per cent. on amounts in excess thereof. This order good till 5 p. m. to-day."

Within the stipulated time a customer was procured who was ready, able, and willing to purchase on the terms specified, and who entered into a contract with the owner for the purchase of the property. Though the sale was not consummated, because of the owner's inability to furnish a sufficient abstract of title, the broker was held to be entitled to his commission.

*Fritch* v. *Hess*, 49 Utah, 75, 162 Pac. 70, is also not apposite to any issue in the instant case.

As we understand the argument of plaintiff's counsel, it may be summarized: Defendants in writing employed plaintiff, a real estate broker, to procure a purchaser for the Richlands holdings. Purchasers were produced by plaintiff who were ready, willing, and able to purchase same on terms specified. Defendants entered into a binding written agreement of sale with the purchasers, the terms being satisfactory to all parties concerned, and which contract was substituted for the proposition to sell for $260,000. By the contract of May 20, 1916, the Richlands holdings were actually sold to the purchasers, and defendants are estopped as against plaintiff to say that the transaction was not a sale of the Richlands holdings. The reasoning is logical. The argument is sound, and it would be unassailable were it not founded upon what to us appears to be a misconception of what the ultimate facts are. The employer of plaintiff was not general. He had a special contract with the Richlands Company and with the individual defendants, if he was employed by the latter at all. That the proposed purchasers produced by plaintiff were ready, able, and willing to buy

on the terms of the contract of March 7, 1916, is not established by the evidence. The contract of May 20, 1916, was not, in our opinion, a contract of sale. It was not an enforceable contract. It was executory and conditional. It provided that, if within a year the State Engineers should determine a drainage system to be necessary for the reclamation of the segregated lands, the Richlands Company should construct such drainage system according to the specifications approved by the State Engineer. As we understand the evidence, the State Land Board would not enter into a contract waiving the drainage clause. Mr. Alexander, the secretary of the Richlands Company, testified that the State Land Board required the drainage provision in the contract; that after May 20, 1916, Story & Steigmeyer, attorneys for Mr. E. J. Shields and his associates, had advised him that they would not approve a contract containing the drainage features. The triparty contract contained a clause providing that the Carey Act contract between the state and the Richlands Company must be "in form satisfactory to the legal firm of Story & Steigmeyer, of Salt Lake City, expressed in writing." How could it be the fault of defendants that a contract satisfactory to Story & Steigmeyer was not obtained from the state when they could not procure a contract with the drainage features omitted and when Story & Steigmeyer had informed defendants that they would not approve a contract containing the drainage clause?

The contract of May 20, 1916, being, therefore, executory and conditional, never having been consummated, not a dollar having been paid thereon, plaintiff was not entitled to the $30,000 commission that was payable to him in the event only of the purchase price being received by the defendants. Being dependent on the approval of the attorneys for the third parties to the contract, the triparty agreement was only tentative and conditional. It was not binding on the parties and was not carried into effect. The execution of such a contract does not give to the broker a right to compensation. 9 C. J. 603.

In *Halprin* v. *Schachne*, 21 Misc. Rep. 519, 47 N. Y. Supp.

711, affirmed in 25 Misc. Rep. 797, 54 N. Y. Supp. 1103, it is held that, where a broker for the sale of real property brings parties together but a contract made by them is by its terms conditional upon the subsequent approval of the attorney for one of them who fails to approve the broker is not entitled to commission. The court says:

"This shows that in law this agreement is made upon a condition, and is dependent upon the performance of that condition; and, if the condition is not complied with, no obligation thereunder arises, and no rights thereunder attach. The rule of law is that a broker is entitled to his commission when the minds of the parties have met on every material particular of the transaction. Here, in this case, however, the minds of the parties in regard to the transaction, have never met, because the validity of the contract was made dependent upon the condition that the defendant's attorney approve of the contract. The defendant's attorney never approved of the contract. In that event the contract and the whole transaction was to be null and void to the same effect as if no transaction whatsoever had been agreed upon and entered into between the parties. For that reason the condition upon which the broker's commission depended, and which entitled him in law to recover, was never fulfilled, and he is not entitled to recover."

Among other cases supporting the doctrine above announced are these: *Hawkins* v. *Green* (W. Va.) 104 S. E. 279; *Merritt* v. *Lillyblade,* 57 Wash. 159, 106 Pac. 621; *Condict* v. *Cowdrey,* 139 N. Y. 273, 34 N. E. 781; *Sullivan* v. *Milliken,* 113 Fed. 93, 51 C. C. A. 79; *Rhodes* v. *Wetherill,* 236 Pa. 66, 84 Atl. 660; *Ward* v. *Kennedy,* 51 Misc. Rep. 422, 101 N. Y. Supp. 524; Id., 122 App. Div. 890, 106 N. Y. Supp. 1149; *Brown* v. *Keegan,* 32 Colo. 463, 76 Pac. 1056; *Cameron* v. *Ayers,* 175 Cal. 662, 166 Pac. 801.

We think the findings of fact and conclusions of law of the trial court were right. and that the record contains no errors justifying a reversal.

The judgment is therefore affirmed, with costs.

CORFMAN, C. J., and GIDEON, THURMAN, and FRICK, J., concur.