**Richmond.**

MURRAY AND WIFE v. RICKARD.

November 23, 1904.

1. REAL ESTATE AGENT—*Commissions—Case in Judgment.*—The owner
   of real estate employed an agent to sell it on terms set out in a
   writing which contained the following as one of the clauses to be
   inserted in the contract of sale: "Should any of the above pay-
   ments not be made at maturity, all former payments to be for-
   feited, and neither party to have any claim upon the other." A
   sale was effected on these terms. The agent was to receive a
   commission of five *per cent.* on the purchase money, to be paid
   out of the payments as made. After making several payments,
   upon which the agent received his commission, the purchaser be-
   came utterly insolvent and defaulted in his payments, and the
   owner took back the land, cancelled the purchaser's obligations
   for future payments, and with his assent sold and conveyed the
   land to another party. The first purchaser forfeited the payments
   already made, and released all claims to the land, for a sum in
   excess of the balance of principal sum due by him. Agent sued
   for commissions on so much of the original purchase money as
   was not paid by the first purchaser.
       *Held:* He was not entitled to recover, as the parties had only
   done what they had the right to do under the terms of their con-
   tract effected through him, and upon which he based his claim for
   compensation. It was further held, upon the evidence, that the
   owner had not, by agreement or conduct, made any change in the
   agent's rights under the original contract of employment.

Appeal from decrees of the Circuit Court of Rockingham
county in a suit in chancery, wherein the appellee was the com-
plainant, and the appellants and others were the defendants.

*Reversed.*

The opinion states the case.

*Conrad & Conrad*, for the appellant.

*John E. Roller* and *Sipe & Harris*, for the appellees.

Cardwell, J., delivered the opinion of the court.

On the 21st day of December, 1892, Mary H. Murray and Henry M. Murray, her husband, by letter authorized W. H. Rickard as a special agent, to make sale of a tract of 44,000 acres of land, known as the Hollingsworth survey, belonging to Mrs. Murray, and situated partly in Virginia and partly in West Virginia, the sale to be made on the following terms:

"At $3.00 per acre, allowing you a commission of 5 per cent. on the purchase, said commission to be paid out of the payments as made.

"The payment for the lands to be as follows: For an option of twelve months a payment within fifteen days of this writing of $5,000.00; at the expiration of twelve months $5,000.00; at the expiration of eighteen months $5,000.00; at the expiration of twenty-four months $5,000.00, and at the expiration of thirty months the balance of the purchase money. The deferred payments to bear interest at the rate of 6 *per cent. per annum* from the date of first payment. Should any of above payments not be made at maturity, all former payments to be forfeited, and neither party to have any claim upon the other. But in the case all the above terms are complied with, then we agree to deliver to the purchaser a good and sufficient deed with general warranty of title for the above land.

"We further agree that the purchaser shall have the privilege of prospecting for coal and other minerals and the use of timbers for railroads through and over the property, also the

right of ingress and egress for himself, laborers, etc.   Yours truly, Mary H. Murray, H. M. Murray."

Pursuant to this agreement Rickard did effect a sale to George A. Wheelock, of New York.   Murray and wife knew nothing of the financial condition of Wheelock, but accepted him upon Rickard's repeated assurance that he was a man of large means and abundantly able to pay for the land upon the terms on which he agreed to purchase it.

Wheelock having on December 22, 1892, made a cash payment of $7,500, on December 23, 1892, Murray and wife executed a deed conveying the property to him, and contemporaneously therewith Wheelock executed a deed of trust, conveying the same property to Holmes Conrad, trustee, to secure the payment to Mrs. Murray of four bonds—one for $7,500, payable one year after date; one for $5,000, payable eighteen months after date; one for $5,000, payable two years after date; and one for $107,000, payable thirty months after date; all bearing date with the deed of trust, and bearing interest from their date.

It will be observed that Mrs. Murray, by the letter of December 21, 1892, at the time she placed the land in the hands of Rickard for sale, contracted to give an option upon the property, but when the parties to the transaction met, Rickard being present, this purpose on the part of Mrs. Murray was abandoned, and an absolute sale was made to Wheelock, the property conveyed to him in fee, and he reconveyed it to Holmes Conrad, trustee, to secure the unpaid purchase money, as before stated.   No objection was made by Rickard at the time, or thereafter, to the transaction as thus consummated.

Wheelock paid the first deferred payment of $7,500, as well as the cash payment above mentioned, and upon these payments Rickard received the commission stipulated for in the contract between him and the vendors of the land.   As to all other pay-

ments Wheelock defaulted and became insolvent, as Mr. and Mrs. Murray were advised from the best sources of information they had access to, including Rickard himself. In a letter from Rickard to Mr. Murray, dated February 18, 1899, he says: "I am now convinced that Mr. Wheelock is not able to pay for the property he purchased," etc. In another letter, of March 1, 1899, addressed also to Mr. Murray, he says: "I deem the claims against Mr. Wheelock as practically worthless, unless we can get other people's money to pay them off. I am forced to this conclusion after a close inquiry as to Mr. Wheelock's financial condition. . . ."

Under date of December 29, 1900, Mr. Murray wrote Rickard the following letter:

"W. H. RICKARD, ESQ.:

"*Dear Sir*,—Upon returning to my office, after an absence of several days, I found yours of 24th.

"As you know of course Mr. Wheelock has defaulted in his payments on the Hollingsworth survey, and we have had negotiations with Mr. DeWit Smith for the purchase of the property, but upon his attorney's investigation the title he found an attachment upon our land by the Harrisonburg Dev. Co. Upon consultation with Major Conrad, our attorney and the trustee in the matter, he advised our foreclosure of the mortgage, or rather the deed of trust, as the best way of getting back our property. This we are about to do. I am informed Mr. Wheelock will assent to this, as our claim you know is a large one, I am sure the land will not sell for enough to pay yours, the Development Company, and ours too.

"Yours very truly,

"H. M. MURRAY."

To this letter Rickard, on the 1st day of January, 1901, re-
plied as follows:

"MR. H. M. MURRAY, Baltimore, Md.:

"*My Dear Sir,*—Your favor of 29 Dec. just recd. & I note
what you say about the attachment of the H. M. & D. Co. and
the advice given you by Maj. Conrad, which ordinarily would
be sound legal advice, but which in this case I think altogether
unnecessary, as you know I am a Director in this Co. (the M.
& D. Co.), and could explain the situation fully if I could see
you. To sell under foreclosure would incur great expense and
commissions for, in my opinion, an unnecessary purpose. The
M. & D. Co. sued Mr. Wheelock for the benefit of its creditors,
and in the course of legal practice this attachment was levied
on all of his assets in this community not to prejudice your pur-
pose or embarrass your title. Every possible move on the part
of Mr. Smith's agts. to get hold of this Co.'s claim has been
made until to-night we have just made them a proposition that
ought to, and I believe will, be acceptable to them, which will
satisfy the Co.'s creditors & thus release any cloud that may
be on your title. Whether this proposition, above referred to,
is acceptable or not, by co-operation you & I can, I feel sure,
without cost, leave you perfectly free to do as you will. . . . "

Thus matters stood until the 29th of January, 1901, when
Mr. and Mrs. Murray, after waiting for nearly ten years for
payment of the purchase money due from Wheelock, sold and
conveyed the Hollingsworth survey, in consideration of $126,-
000, paid and secured to be paid, to the Chesapeake Western
Company, a corporation, which deed, after setting out the con-
veyance by Mr. and Mrs. Murray to Wheelock on December
23, 1892, and the reconveyance of the property by him to
Holmes Conrad, trustee, to secure Wheelock's several obliga-
tions for the deferred instalments of the purchase money, and

that three of the four several obligations were long since over-due and unpaid, and that Mrs. Murray had agreed to sell and convey the land to the Chesapeake Western Company, further recites, "and the said Wheelock, in consideration of the can-cellation and surrender to him of his said three obligations, hath agreed to unite with the said Mary H. Murray in a deed conveying the same, and the said Holmes Conrad, who as trustee in the said deed of trust holds in trust the legal title to said lands, doth, by the direction of all the parties concerned, unite herein," etc.  Contemporaneously with this conveyance to the Chesapeake Western Company, it reconveyed the prop-ery to Holmes Conrad, trustee, to secure the payment of the deferred instalments of the purchase money to Mrs. Murray, and Mrs. Murray surrendered to Wheelock his unpaid obliga-tions.

Rickard then demanded five *per cent.* on $117,000 (the un-paid principal of the Wheelock purchase price), with interest from December 23, 1892, which Mrs. Murray declined to pay, and thereupon Rickard filed his bill in chancery against Mr. and Mrs. Murray, Wheelock, and the Chesapeake Western Company, in which—after reciting the sale to Wheelock in De-cember, 1892, under and by virtue of the letter of December 21, 1892, the letter being filed as the "contract" on which his claim is based; that there was still $117,000 of the principal unpaid by Wheelock; the sale by Mrs. Murray to the Chesa-peake Western Company at $126,000, etc.—he claims: "that the sum of $5,850.00 is due and owing to him under his contract aforesaid, by the said Mary H. Murray and Henry M. Murray, and with interest thereon from December 23, 1892, and that it is a part of the purchase price of said land, and under the circumstances of the transaction, and the agreement aforesaid, he is entitled in equity to the lien created by said deed of trust from Wheelock to said Conrad, trustee."  At the same time

he sued out an attachment which was levied on the land and served on the Chesapeake Western Company.

To this bill Mr. and Mrs. Murray demurred and made answer, and also moved the court to require Rickard to give an attachment bond, etc. The demurrer and motion to require an attachment bond were both overruled, and upon the hearing of the cause, upon the bill and answer, the deposition of Rickard, and sundry letters written by him to Mr. and Mrs. Murray, filed with Rickard's deposition, and certain letters of Mr. and Mrs. Murray to him, also filed with his deposition, the Circuit Court entered its decree, by which it held that Rickard was entitled to full commissions on account of the sale to Wheelock, and that there was a balance due on that account from Mrs. Murray of $5,850, with interest, as set out in the decree. From this decree Mr. and Mrs. Murray obtained an appeal to this court.

The controlling question is what is the true interpretation of the contract between appellants and appellee, Rickard, contained in the letter of December 21, 1892.

It will be observed that the contract contains this clause: "Should any of the above payments not be made at maturity, all former payments to be forfeited, and neither party to have any claims upon the other." It is insisted on behalf of appellee that this stipulation has no effect upon the appellee, Rickard, but merely protected the rights of appellants and Wheelock when the latter defaulted in the payment of his purchase money. It is upon this contract, and this contract alone, the appellee can recover, and it is upon this contract that the claim he asserts is founded.

It would seem too clear to admit of argument that the parties themselves understood that the compensation to appellee, Rickard, was to be contingent upon payments being made by Wheelock, in performance of his undertaking as purchaser.

The contract expressly stipulates that a commission was *to be paid out of the payments as made,* and on January 16, 1893, Rickard wrote appellants as follows: "Will you please forward me in proper form your obligation for commissions on sale of land as per our agreement. Of course you will so word your acknowledgment as to provide against any collections on same further than the money or payments are made to you." To this letter appellants on January 18, 1893, made the reply: "You have effected a sale of the Hollingsworth survey to George A. Wheelock, Esq., of New York. Our agreement with you is that we are to pay you a commission of 5 *per cent.* on the purchase money as it is paid to us by the said Wheelock.

"The first payment of $7,500.00 having been made on December 22, 1892, we paid you your commission on that, amounting to three hundred and seventy-five dollars." .

When Wheelock paid the first deferred payment, appellee received his commission of 5 *per cent.* thereon, and there is not a word from him that shows a contention on his part that he was entitled to commissions on the whole of the purchase money agreed to be paid by Wheelock, whether the same was paid or not, until after appellants had surrendered to Wheelock his purchase money bonds as to which he had defaulted, and which they surrendered in accordance with the very terms of the contract between appellants and appellee, Rickard, he (Wheelock) surrendering all claim of right to any interest in the land, and forfeiting the purchase money which he had paid, and upon which Rickard had received his commission.

"But," say counsel for appellee, "while the letter of December 21, 1892, authorized the appellee to make sale of the property, it was expected and contemplated by both parties that the sale when made would take the form of an option, and would not be in the form of an absolute sale, and that by reason of the change from an option merely to an absolute sale to Wheelock,

the rights of Rickard were also changed so that he became entitled to an interest in the land under the deed of trust from Wheelock to Conrad, trustee.

As we have already observed, the change here referred to was made in the presence of appellee and with his apparent assent, since he did not then nor thereafter indicate any objection, and this suit was brought on the contract contained in the letter of December 21, 1892, made an exhibit with the bill, and the claim asserted founded solely on that letter.

This brings us to the consideration of the correspondence between the parties after the letter of January 18, 1893, from appellants to appellees, written in answer to the request from appellee that they forward in proper form their obligation for commissions on the sale of the land, as per the agreement, both of which letters so far as pertinent are set out above. Now the contention is made that by the correspondence between the parties thereafter, both understood that appellee had an interest in the land, or some interest growing out of the deed of trust from Wheelock to Conrad, trustee, different from the interest provided for in the contract between the parties.

They rely, first, upon the letter from Mr. Murray to the appellee of December 29, 1900, as showing that the writer, when saying "I am sure the land will not sell for enough to pay yours, the Development Company, and ours too," was speaking of three claims to be satisfied out of a sale of the land, the one appellee's claim for commissions, the other a claim of the Development Company growing out of an attachment levied upon Wheelock's interest in the land, and the third the claim of appellants for the unpaid purchase money due them. This contention is wholly refuted by the letters of appellee to which we shall refer. In reading the letters just referred to and those to follow, it must be borne in mind that after the deed of trust from Wheelock to Conrad, trustee, had been executed and

recorded, the Harrisonburg Mineral & Development Company, of which appellee was a director, levied an attachment upon the interest of Wheelock in the lands of the Hollingsworth survey for the benefit of its creditors, and owned some land, or an interest in land, similarly located to that of the Hollingsworth survey.

The letter of December 29, 1900, was in reply to a letter from appellee of December 24, 1900, in which the writer says that the Chesapeake Western people are agitating the extension of their railroad line, and through an agent trying to purchase of the Harrisonburg M. & D. Co. the claim it holds against Mr. Wheelock, and we are offered a price considerably less than the face value." There can be no doubt that he here meant by "we" the H. M. & D. Co., and when he wrote "as *our interest is mutual,* I write this in confidence to know whether you are being tried in the same manner and to what extent, clearly he meant that the interest of the H. M. & D. Co., of which he was a director and of which he was writing, and the interest of appellants was mutual. In appellee's letter of February 18, 1899, he speaks of securing a railroad "through our county into your lands, which will very much enhance their value and *secure you and our company 'the money due from Mr. Wheelock."* In a letter from him of March 1, 1899, he says, "what can be done with your lands and ours," etc., and could have had no other meaning by "ours" than the H. M. & D. Co. He says in a letter of January 1, 1901, a part of which is quoted above, there is a deep laid scheme "to get the holdings *of you and us* for a song," having just above in the same letter spoken of a move to "get hold of this company's claim has been made here to-night, and *we* have just made them a proposition."" Here he clearly was speaking of no individual claim he had, but was referring alone to the claims of appellants and the H. M. & D. Co. So that it would seem perfectly clear and con-

clusive that when Mr. Murray, in his letter of December 29, 1900, used the language, "yours, the Development Company," he did not mean separate but the same claim, and the word "yours" relates to the company, while the words "the Development Company" were used only to make clearer what was meant by "yours." There is not a single instance after the letters in January, 1893, up to the letter written by appellee February 26, 1901, addressed to appellants, in which he says: "I learn that Mr. Wheelock, his successor or assign, has made another payment on the lands I sold to Mr. Wheelock for you. Kindly let me know when I can expect my commission on same, and what amount you have received this time," where appellee has ever spoken of having a claim on account of this sale made by him to Wheelock, or where he makes or refers to any claim in which he is interested personally, except that of the H. M. & D. Co., where he says "we" and "ours" in referring to it and its affairs. It was unquestionably the purpose of appellee in dissuading appellants from enforcing their deed of trust in order to get back the title to their lands, Wheelock having become insolvent, to protect the interest of the H. M. & D. Co., and he argues, to cause them to desist from enforcing the deed, that it would be a useless expense incurred by them, as was clearly the case from information obtained by appellants, the main part of which was obtained from appellee himself.

The situation was this: Appellants, by enforcing their deed of trust, would have incurred a useless expense, and they could derive no advantage from a suit against Wheelock for the purchase money due by him for two reasons; one was, Wheelock was insolvent, and the other was that, by the very terms of the contract under which the land was sold to him, Wheelock had a right to do just what he did, forfeit what he had paid on the land, surrender all claim thereto and demand from appellants the return of his obligations. Therefore the sale by appellants

of the land, with the assent of Wheelock, was no wrong to appellee.

"A commission agent employed to negotiate a sale upon the terms that he is to be paid a commission on the amount of purchase money, or on the happening of a certain event, will not be entitled to any commissions until the purchase money has been received, or the event has happened, unless there has been fraudulent delay or wilful neglect on the part of the employer." 2 Addison on Contracts, s. 925.

In the case at bar there has been neither a fraudulent delay nor wilful neglect on the part of appellants in any effort that they should have made to collect the purchase money due them from Wheelock. They waited patiently for its payment for nearly ten years, and upon assurance from appellee himself that he (Wheelock) was hopelessly insolvent and could never pay, they sought a purchaser elsewhere for their lands.

In *Crockett* v. *Grayson*, 98 Va. 354, 36 S. E. 477, there was an agreement between Grayson and Crockett that the latter was to have all over and above $11,000 he could realize from a sale of 700 acres of land belonging to the former. Crockett sold the land to Spiller at $14,000, and an agreement was entered into between Grayson and Spiller with this stipulation: "That said W. H. Spiller is to assume for payment for said Grayson the sum of $4,000.00, which the said Grayson represents as being the whole amount of the liens against the said property hereby sold to the said Spiller, and which the said Grayson states will clear the title to the land hereby sold; but if the amount of liens by judgment or otherwise against the said Grayson exceeds the sum of $4,000.00, then the said Spiller is at liberty to declare this agreement null and void." It was found that the judgments were apparently $40,000, and Spiller exercising the right reserved in the contract, declared the contract void, refusing to go further. Crockett sued Gray-

son for the $3,000 excess over $11,000 which Grayson had agreed to take, on the ground that it was no fault of his (Crockett) that Spiller did not take the property after the agreement was entered into in writing between Grayson and Spiller. The verdict and judgment in that case was for the defendant Grayson, and upon a writ of error to this court, the opinion says: "It is true that, owing to the efforts of plaintiff in error, Spiller was induced to enter into a contract for the purchase of the land in question upon terms satisfactory to Grayson, but that, we conceive, is not sufficient, for that contract contained a provision, by virtue of which Spiller reserved to himself the privilege of annulling it if a fact was made to appear over which Grayson had no control."

In the case at bar the situation is similar. Under the terms of the contract the purchaser had the right to stop paying, lose what he had paid, and cancel further obligation. Appellee was made a special agent to sell under that contract. He did make a sale under the contract, and upon it he relies in this suit. Wheelock having forfeited what he had paid, and appellants returning his bonds to him, released all claim to the property, and, having done this, neither party had any claim on the other. This was what their contract provided for, and they had a right so to act under it, without obtaining the consent of appellee, Rickard, the effect of which was to put an end to the whole matter, and place the parties in the position they were before the sale was made, save and except that Wheelock had lost what he had paid on the land, out of which appellee obtained that to which he was entitled, and was left with no ground upon which to demand of appellants any further compensation for his services in securing Wheelock as a purchaser.

We see no application whatever of the case of *Peters* v. *Anderson*, 88 Va. 1051, 14 S. E. 974, relied on by counsel for appellee, to the case at bar. The cases are wholly dissimilar.

In that case there was no agreement between the parties, and the controversy was solely as to how the compensation earned by Anderson, the agent, was to be paid—whether out of the cash payment, or proportionately as the payments were made for the property sold. The opinion says: "The record dis-closes no positive agreement between the parties upon the point in controversy, and the matter must therefore be determined in accordance with what seems to be the equities of the case," clearly intimating that where there was a contract between the seller and the agent the contract would control, but in a case where there was no contract it would not be equitable to re-quire the commissions to be paid out of the cash payment. In other words, the agent would be entitled to his proportionate share of the cash payment, and so with respect to any future payments that might be made.

To hold in the case at bar that appellee was entitled to commissions on the purchase money as to which Wheelock de-faulted, would be to set at naught the contract between the parties and to make for them a new contract. Appellants have not received the purchase money due for their lands, either from Wheelock or the Chesapeake Western Company, and *non constat* that they will ever receive it; but, be that as it may, they have never received any money out of which ap-pellee was entitled to commissions upon his sale to Wheelock, which have not already been paid to him.

We are, therefore, of opinion that the decree appealed from is erroneous, and it will be reversed and annulled; and this court will enter such decree as the Circuit Court should have entered, dismissing appellee's bill.

*Reversed.*